UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>UPPER CRUST, LLC, ET. AL.<br><br>Debtors. | CHAPTER 7<br>CASE NO. 12-18134-HJB |
| MARK G. DEGIACOMO,<br>CHAPTER 7 TRUSTEE OF THE UPPER CRUST<br>LLC, ET AL,<br><br>Plaintiff,<br><br>v.<br><br>JORDAN TOBINS and<br>STEFANY TOBINS,<br><br>Defendants. | ADVERSARY<br>PROCEEDING<br>NO. 14-01163<br><br>**ORAL ARGUMENT<br>REQUESTED** |

## MOTION FOR SUMMARY JUDGMENT
(Memorandum of Law Incorporated)[1]

Pursuant to Fed. R. Civ. P. 56 (made applicable to this adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure), Defendants Jordan and Stefany Tobins (collectively, the "Tobins") move for summary judgment on all claims asserted by the Trustee.

### INTRODUCTION

Jordan Tobins ("Jordan") is a former member and manager of the Upper Crust, LLC (the "Upper Crust"), who, with Joshua Huggard ("Huggard") and Brendan Higgins ("Higgins"),

---

[1] Jordan and Stefany Tobins previously filed a Renewed Motion to Withdraw Reference. The Tobins maintain that the United States District Court for the District of Massachusetts is the appropriate forum to resolve this dispute, including the Motion for Summary Judgment.

1

ME1 21671228v.1

operated a series of pizza restaurants known as the "Upper Crust." After allegedly discovering that Jordan and his then-girlfriend and now-wife, Stefany Tobins ("Stefany"), diverted funds from the Upper Crust, Huggard and Higgins individually and derivatively on behalf of the Upper Crust filed an action seeking to recover these funds. By Settlement Agreement and Mutual Release dated July 31, 2013 (the "Settlement Agreement"), the Upper Crust released all of its claims against Jordan and Stefany, including claims for the alleged diversion of proceeds.

By this action, Mark G. DeGiacomo, the Chapter 7 Trustee of the estate of the Upper Crust (the "Trustee"), has asserted the same claims (i.e., diversion of proceeds), against the same parties (i.e, Jordan and Stefany) that the Upper Crust previously released. The Trustee's claims fail as a matter of law because they are barred by the previously executed Settlement Agreement by which the Upper Crust immediately discharged its claims and agreed not to sue the Tobins, particularly where the Trustee has retained the consideration paid by the Tobins for the release.

**UNDISPUTED CONCISE STATEMENT OF MATERIAL FACTS ENTITLING THE TOBINS TO JUDGMENT AS A MATTER OF LAW**

1. In or around 2005, Jordan, Huggard and Higgins formed the Upper Crust, which was the sole member of approximately fourteen (14) single-asset limited liability companies, which did business as the Upper Crust. (Affidavit of Richard Briansky ("Briansky Aff."), ¶ 2; Chapter 7 Trustee's Response to Defendants' Request for Admission (the "Response") No. 1, a genuine copy of which is attached to the Briansky Aff. as **Exhibit A**.)

2. On or about April 5, 2012, the Upper Crust, among others, filed an action against Jordan and Stephany, two other corporations formed by Jordan (Coletrain LLC and Coleman LLC), and the Upper Crust's former accountant in Massachusetts Superior Court, Suffolk County, C.A. No. 12-1346 (the "Lawsuit"). (Briansky Aff. ¶ 3; Complaint, a genuine copy of which is attached to the Briansky Aff. as **Exhibit B**; Response at Nos. 11, 12.) The Upper Crust

sought to recover money allegedly diverted by Jordan and others for personal purposes. (Id.) In particular, the Lawsuit alleged *inter alia* that:

- "Beginning in or about the end of 2007, Jordan commenced a course of conduct that would …systematically loot Upper Crust;"

- "Jordan charged over $750,000 [to corporate credit cards] for purposes that had no relationship whatsoever to the Upper Crust business;" and

- "Jordan misused corporate checks for personal expenses, including the down payment on a personal residence, furnishing and improving three residences, boat maintenance and dockage, and the lease of three Mercedes Benz cars."

(Id.; Response at Nos. 14 to 17.)

3.  In response to these claims, Jordan asserted counterclaims and a third party complaint. (Briansky Aff. at ¶ 4; Counterclaims and Third Party Complaint, a genuine copy of which is attached to the Briansky Aff. as **Exhibit C**.)

4.  The Upper Crust alleged that Jordan's "total improper gain could exceed one million dollars." (Id.) The Upper Crust also alleged that Stefany improperly received payroll checks from the Upper Crust exceeding $27,000 despite the fact that she did not provide services for the Upper Crust. (Id.)

5.  By "Settlement Agreement And Mutual Release" dated July 31, 2012 (previously defined as the "Settlement Agreement"), the Upper Crust[2] agreed that in exchange for a payment of $250,000 and other assumption of debt by Jordan that it "shall" dismiss the litigation "with prejudice," release the Tobins, and agree not to "file, charge, claim or sue" the Tobins. (Briansky Aff. at ¶ 5; Settlement Agreement, a genuine copy of which is attached to the Briansky Aff. as **Exhibit D**; Response at No. 19.)

---

[2] The Settlement Agreement defines "Upper Crust" as "The Upper Crust, LLC as well as any and all members, managers, shareholders, owners, principals, parents, subsidiaries…predecessors, successors and representatives."

3

6.      Specifically, the Settlement Agreement provided *inter alia*:

> 18.     Tobins will pay or cause to be paid, by cash, bank check or wired funds, $250,000 to the Upper Crust, said payment to be made no later than October 1, 2012 (the "Closing Payment") and shall be made to an account or payee as designated by the Upper Crust in writing. Upon receipt of said Closing Payment:
>
>> a.    Tobins shall receive 100% ownership of Coleman, Coletrain and Cocobling, including the domain names associated with each (including theuppercrustpizzeria.com/) and the assets owned by said companies. As part of this traction, Huggard/Higgins will provide Tobins with full access to his company email account. Thereafter, no party will attempt to access, use or interfere with the email account of any other party, whether that account has been used for personal or business purposes. Tobins shall not make any reference to or mention of Huggard/Higgins anywhere on theuppercrustizzeria.com or elsewhere in promotional materials, but Tobins has no obligation to change nay menu items.
>>
>> b.    Higgins/Huggard shall collectively receive 100% ownership of the Upper Crust and JJB.
>>
>> c.    The Litigation shall be dismissed with prejudice, with all rights of appeal waived and each side bearing its own costs and attorneys' fees.
>>
>> d.    In the event that the Closing Payment is not received by the Closing Date, this Agreement shall, at the option of Huggard/Higgins become null and void.
>
> \* \* \*
>
> 22.     Tobins, Coletrain, Coleman, and/or Cocobling will assume, pay and resolve the following liabilities as they become due
>
>> a.    The class action liability (Pinto, et al. v. Upper Crust el al., Massachusetts Suffolk Superior Court, Civil Action No. 2010-02847) up to $250,000. Tobins, Coletrain, Coleman and/or Cocobling agree to pay 24% of any amounts paid over $250,000 and, Higgins/Huggard, Upper Crust and/or JJB will pay 76% of any such excess.

4

> b. The liability to the Department of Labor ("DOL") which may result from settlement or trial on account of the ongoing investigation by the DOL of the Former Upper Crust Entities.
>
> c. 24% of the liability in the action <u>ZVI Construction Company, LLC v. The Upper Crust, LLC et al.</u>, Massachusetts Superior Court, Civil Action No. 2012-1369, with Huggard/Higgins, Upper Crust and/or JJB paying 76% of such liability.
>
> \* \* \*
>
> 26. Notwithstanding the foregoing, Tobins agrees to pay any amounts due his grandmother loaned by her to the Former Upper Crust Entities . . . .
>
> 28. Subject to the foregoing, the Huggard/Higgins Parties[3] and Hurley do hereby remise, release and forever discharge the Tobins Parties of and from any and all debts, actions, causes of, [sic] action, suits, accounts, covenants, contracts, omissions, liens, controversies, agreements, damages, and any and all claims, sums of money, demands and liabilities whatsoever of every name and nature, both in law and equity, known or unknown, direct or derivative, which the Huggard/Higgins Parties and/or Hurley now have or ever had against any of the Tobins Parties, including those claims which were or could have been asserted in the Litigation. The Huggard/Higgins Parties and Hurley further agree and promise that they will not file, charge, claim, sue or cause or permit to be filed or charged, any action or claim for damages or other relief against any of the Tobins Parties for any matter arising from the creation of this earth to the date of the execution of this Agreement. Nothing in the foregoing release shall relieve the Tobins Parties of their obligations under this Agreement or for any act occurring after the receipt of the Closing Payment.
>
> \* \* \*
>
> 35. This Agreement was negotiated in good faith and constitutes a fair and reasonable resolution of this dispute. . .

(<u>Id</u>.)

---

[3] The Settlement Agreement defines the "Huggard/Higgins Parties" as "Huggard, Higgins, Upper Crust, JJB and Cocobling"

ME1 21671228v.1

7. To the extent that any disputes arose under the Settlement Agreement, the parties agreed that the dispute "shall" be mediated by Thomas Maffei and if not settled by mediation, "Mr. Maffei shall decide the matter in binding Arbitration." (Id.)

8. On September 28, 2012, Jordan caused $250,000 to be paid to the Upper Crust by having the funds wired to the Upper Crust's counsel. (Briansky Aff. ¶ 6; Deposition Transcript of Mark DeGiacomo ("DeGiacomo Tr.") at 64,[4] a genuine copy of which is attached to the Briansky Aff. as **Exhibit E**.) The Trustee confirmed that:

> The settlement agreement was signed by everybody. We all agree on that. The 250 was paid in a timely manner. We all agree on that. And I think we agree that certain aspects of that settlement agreement were never consummated. The legal effect of that is part of this case.

(Id. at 73.)

9. Although obligated to file a stipulation of dismissal, the Upper Crust failed to do so and the Lawsuit remains active (but administratively stayed). (Settlement Agreement.) Instead, on October 4, 2012, the Upper Crust filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. (Response at No. 37.)

10. On October 5, 2012, the Debtors filed a "Motion for Authorization of (1) The Interim and Permanent Use of Cash Collateral, (2) The Granting of Adequate Protection, (3) Entry of Scheduling Order Regarding Continued Use of Cash Collateral and (4) Additional

---

[4] The Trustee further testified:

> Q. Did Mr. Tobins pay or cause to be paid by cash, bank check or wire funds $250,000 to the Upper Curst.
>
> A. Yes.

(DeGiacomo Tr. at 64.)

6

ME1 21671228v.1

Relief." (Briansky Aff. at ¶ 7; Motion, a genuine copy of which is attached to the Briansky Aff. as **Exhibit F**.)

    11.    The Motion claimed that:

- the Debtors discovered that "there had apparently" been "improper diversion of corporate funds for non-business uses" (Motion at 6);

- on April 5, 2014, the Upper Crust among others filed a complaint against Jordan Tobins claiming that he diverted Upper Crust funds for his personal purposes (Id. at 7); and

- The Upper Crust, among others, "executed a 'Settlement Agreement and Mutual Release' as of July 31, 2012 that purported to resolve the issues between the parties. The Settlement…contemplated" the dismissal of the litigation against Tobins, "an apportionment of the responsibility for the Wage Litigation, the ZVI Litigation and certain other litigation among the parties…. Notwithstanding that no court approvals were obtained, Tobins paid the $250,000 to the Upper Crust on October 1, 2012." (Id.)

    12.    On March 6, 2013, the Upper Crust's cases were converted to Chapter 7 and Mark DeGiacomo was appointed as the Chapter 7 trustee.

    13.    On August 13, 2014, the Trustee filed an Adversary Complaint against the Tobins claiming that the Tobins diverted funds from the Upper Crust to themselves.[5] (Response at No. 50.)

---

[5] Before filing the Adversary proceeding, by letters dated January 29, 2014, the Trustee demanded payments from both Jordan and Stephany. The Demands omitted (presumably intentionally) any reference to the Settlement Agreement. Instead, the Demands summarily concluded that the Tobins received a series of what the Trustee believe to be fraudulent transfers and requested payment in the amount of approximately $1.38 million. (Briansky Aff. at ¶ 8; Demand, a genuine copy of which is attached to the Briansky Aff. as **Exhibit G**.) By letter dated February 14, 2014, Tobins responded to the

7

ME1 21671228v.1

14. The Adversary Complaint summarily concludes in three paragraphs that:

- "[B]eginning in or around the end of 2007, Jordan began transferring funds belonging to the Debtors to himself to pay for personal expenses and to support his extravagant lifestyle with his then girlfriend and alleged employee of the Debtors, Stefany;"

- "During the period of October 4, 2008 through the Petition Date, the Debtors transferred, other than salary, a total of $1,372,592.00 to or for Jordan's benefit (the 'Four-Year Transfers to Jordan'). These transfers were used to pay for personal real estate or other personal expenses . . . .;" and

- "During the period of October 4, 2008 through the Petition Date, the Debtors transferred, other than salary, a total of $49,934.00 to Stefany (the 'Four-Year Transfers to Stefany [sic]) an alleged employee who actually performed little or no services for the Debtors. These transfers were made to or for Stefany's benefit to pay personal expenses and to pay insurance premiums . . . ."

(Adversary Complaint). Based upon these factual allegations, the Trustee asserted eleven claims for fraudulent conveyance against the Tobins. (Id.)

## ARGUMENT

By its plain language, the Settlement Agreement bars the Trustee's claims. When parties resolve disputed claims, the agreement is referred to as a "compromise and settlement." P.L.A.Y., Inc. v. Nike, Inc., 1 F. Supp. 2d 60( D. Mass. 1998) (citing Corbin on Contracts, § 1278). Such an agreement:

---

Demands (the "Response"). In the Response, the Tobins denied that any funds they received were "fraudulently transferred," denied they are obligated to pay any funds to the bankruptcy estates of the Upper Crust, and rejected the Trustees' attempt to avoid the Settlement Agreement, which specifically bars the assertion and prosecution of these claims. (Briansky Aff. at ¶ 9; Response to Demand, a genuine copy of which is attached to the Briansky Aff. as Exhibit H.)

8

ME1 21671228v.1

> is usually intended to operate as a substituted contract and an immediate discharge of the prior claims so compromised. After such a discharge, no action is maintainable on the previous claims, whether for an alleged breach of contract or otherwise. Rather the rights of the parties are now determined by the substituted contract – the compromise and settlement.

P.L.A.Y., Inc. v. Nike, Inc., 1 F. Supp. 2d 60 (D. Mass. 1998); see also Restatement (Second) of Contracts, § 279 ("The substituted contract discharges the original duty and breach of the constituted contract by the obligor does not give the obligee a right to enforce the original duty."). Massachusetts courts generally find that an agreement is a substituted contract if it reflects either expressly or by clear implication an intention that it serve as an immediate satisfaction and discharge of existing claims. Id. (citing cases). Language representing that a party "does hereby release, acquit and forever discharge" the other party from "any claims, demands, liabilities and causes of action" demonstrates the parties' intent to form a substituted contract. See id. at 64-65; Rucker v. Rucker, 257 Or. App. Ct. 544, 549 (2013) (language in settlement agreement that parties "mutually release, acquit and forever discharge one another . . . from any and all claims . . ." demonstrated that parties intended to replace prior agreement with the substituted terms of the settlement agreement).

In this case, the plain language of the 11-page integrated, written, jointly executed Settlement Agreement manifests the parties' intent to resolve immediately and discharge all possible claims between the Upper Crust and Tobins. See e.g., Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 15 (1st Cir. 2001) (holding that where the material terms of settlement were agreed upon, plaintiff "cannot escape the consequences of her agreement because she spoke but did not write"); Basis Tech. Corp. v. Amazon.com, 71 Mass. App. Ct. 29, 37 (2008) ("If . . . the parties have agreed upon all material terms, it may be inferred that the purpose of a final document

9

which the parties agree to execute is to serve as a polished memorandum of an already binding contract.") (internal citations omitted). In particular, the Settlement Agreement represented that:

- the "Parties sought to resolve the Litigation and did so successfully by mediating the matter on July 31, 2012, resulting in Memorandum of Understanding executed by all parties, which provided for the execution of this Agreement;"

- "the Parties may begin implementation of this settlement as of the date of the execution of the Memorandum of Understanding;"

- "the Agreement was negotiated in good faith and constitutes a fair and reasonable resolution of the dispute;" and

- parties "remise, release and forever discharge" and terminate immediately "any and all" "claims" "known or unknown," "direct or derivative" which [the Upper Crust (and Huggard and Higgins) and Tobins] "now have" or "ever had."

In a similar case, P.L.A.Y., Inc. v. Nike, Inc., 1 F. Supp. 2d 60 (D. Mass. 1998), after signing a "Settlement Agreement and Release of Claims," which imposed obligations upon both parties (including a series of payments), PLAY (like the Trustee in this case) filed a lawsuit against the releasor, Nike. PLAY asserted the same claims that it previously settled claiming that Nike failed to fully perform its obligations under the settlement agreement and, as a result, it retained the right to assert the previously settled claims. Id. at 63. The Court dismissed PLAY's claims concluding that the "Settlement Agreement and Release of Claims" was a substituted contract. Id. at 64. The Court recognized that the Settlement Agreement contained broad-based general releases immediately releasing and "forever" discharging "claims" against Nike, which demonstrated the parties' "present and immediate discharge of possible claims." Id. at 64.

10

Based upon the specific language selected by the Parties in the Settlement Agreement, the Court concluded:

> There is nothing ... to suggest any reason for a delayed application of the discharge of NIKE's liability or that the discharge was conditional upon the occurrence of a future event. Rather, the explicitly stated purpose of the Agreement is "the complete and final settlement of all claims, demands rights and causes of action. Even the title of the Agreement "Settlement Agreement and Release of Claims," suggests this purpose.
>
> * * *
>
> Simply put, the Agreement reflects the parties' intention to immediately discharge all prior claims. It is properly characterized as a substitute contract.

Id.

The Settlement Agreement here, like the one in P.L.A.Y., demonstrates that the parties intended the Settlement Agreement to be a substituted contract and immediately discharge all possible claims. As in P.L.A.Y., the Settlement Agreement contained broad-based, general releases immediately and "forever" discharging and releasing "any and all" "claims" "known or unknown," "direct or directive" which the Upper Crust (Huggard and Higgins) "now have" or "ever had." See id. at 64; Rucker, 257 Or. App. Ct. at 549 (finding that settlement agreement was a substituted contract where parties agreed to resolve claims during mediation, memorialized their agreement in writing, and executed a settlement agreement stating that the parties "mutually release, acquit and forever discharge one another . . . from any and all claims . . . arising from or in any way related to the monies loaned or advanced . . . for support services . . ."). Similarly, as in P.L.A.Y., the Settlement Agreement does not contain any language that suggests a reason to delay the application of the waiver and release of claims or that the waiver and release of claims was conditioned upon a future event. To the contrary, the Settlement Agreement imposed a mandatory and immediate obligation "upon" the Upper Crust's "receipt" of the $250,000 to

11

dismiss the "Litigation . . . with prejudice." Since the Settlement Agreement is a substituted contract, the Trustee does not have right to sue on the original claims (even if the Tobins did not fully comply with the Settlement Agreement). See id. at 64; Restatement (Second) of Contracts, § 279(2). Rather, the Trustee's remedy (if any) is to sue for breach of the Settlement Agreement.

Nor can the Trustee reconcile any claim that the Settlement Agreement is "unenforceable" (and essentially rescinded) with his continued retention of the $250,000 in consideration that Tobins paid for the release and waiver. See id. at 66 ("Massachusetts Supreme Judicial Court has often recognized that restoration of a benefit is a condition precedent to maintaining a rescission action."). "The idea of rescission is to put the parties back where they were before the contract; to undo the contract. It is the same with a release, which after all is just another contract." Fleming v. U.S. Postal Service AMF O'Hare, 27 F.3d 259, 262 (7th Cir. 1994). Thus, " a release can be rescinded only upon a tender of any consideration received. . . ." Id. at 260. "The tender requirement is not a remedy. It is a protection for defendants . . . ." Id. at 261. "Not even plaintiffs are helped in the long run by a rule allowing them to have their cake and eat it, for a defendant will not pay as much for a release that the plaintiff can challenge without having to repay the money as the price of maintaining the challenge." Id. at 260.

Here, the Trustee is attempting to "have [his] cake and eat it" too. The Trustee has retained without explanation or legal justification the $250,000 paid by the Tobins to buy peace (through the Settlement Agreement) while he continues the war by asserting and prosecuting the previously released claims. The Trustee has not tendered or even offered to tender the $250,000 paid by the Tobins. In fact, nowhere in the Adversary Complaint is there any reference to the Settlement Agreement or the consideration paid by the Tobins. The Trustees failure to tender or even offer in the Adversary Complaint to tender the $250,000 bars the claims. See Fleming, 27

12

F.3d 259 (holding that plaintiff was not entitled to rescind settlement agreement in employment discrimination case and be reinstated to her job where she did not tender or offer to tender the full $75,000 she had received from the defendant to release her claims).

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Court should grant the Tobins' Motion for Summary Judgment and any other relief it deems appropriate.

JORDAN TOBINS and
STEFANY TOBINS
By their attorneys,

/s/ Richard E. Briansky
Richard E. Briansky (BBO# 632709)
Amy B. Hackett (BBO# 676345)
McCarter English, LLP
265 Franklin Street
Boston, MA 02110
Phone: (617) 449-6568
Fax:    (617) 607-9312
rbriansky@mccarter.com
ahackett@mccarter.com

Dated: December 18, 2015

## CERTIFICATE OF SERVICE

I, Richard E. Briansky, hereby certify that this document was filed through the Court's ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants as follows on December 18, 2015.

/s/ Richard E. Briansky

ME1 21671228v.1