**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**THE UPPER CRUST, LLC, et al.,**
Debtors

Chapter 7
Case No. 12-18134-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MARK G. DEGIACOMO, CHAPTER 7**
**TRUSTEE OF THE UPPER CRUST, LLC,** et al.,
Plaintiff,
v.
**JORDAN TOBINS and STEFANY TOBINS**,
Defendants

Adv. P. No. 14-1163

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

## I. INTRODUCTION

The matters before the Court are 1) the Motion for Summary Judgment filed by the Defendants, Jordan Tobins (individually, "Jordan" or "Tobins") and "Stefany Tobins ("Stefany" or "Mrs. Tobins") (collectively, the "Defendants"); 2) the Trustee's Motion for Partial Summary Judgment filed by the Plaintiff, Mark G. DeGiacomo, the Chapter 7 Trustee of the estate of the Upper Crust, LLC and related entities (collectively, the "Upper Crust" or the "Debtor");[1] and 3) the "Defendants' Opposition to Motion for Summary

[1] The other Chapter 11 cases substantively consolidated with The Upper Crust, LLC (Case No. 12-18134) are The Upper Crust - Back Bay, LLC (Case No. 12-18135), The Upper Crust-Fenway, LLC (Case No. 12-18136), The Upper Crust-Harvard Square, LLC (Case No.12-18137), The Upper Crust-Hingham, LLC (Case No.12-18138), The Upper Crust-Lexington, LLC (Case No. 12-18139), The Upper Crust-State Street, LLC (Case No. 12-
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Judgment and Cross-Motion for Summary Judgment." Through their Motion for Summary Judgment, the Defendants seek judgment with respect to all counts of the Trustee's ten count Complaint pursuant to which he seeks the following relief: 1) avoidance of certain transfers to Jordan that took place within two years of the petition date (the "Two Year Transfers") as fraudulent transfers under § 548 of the Bankruptcy Code (Count I); 2) recovery by the Trustee of the Two-Year Transfers, which allegedly total $406,328, to Jordan under 11 U.S.C. § 550 (Count II); 3) avoidance of certain transfers to Jordan that took place within four years of the petition date (the "Four Year Transfers") under 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 5(a)(2) (Count III); 4) avoidance of the Four-Year Transfers to Stefany Under 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 5(a)(2) (Count IV); 5) avoidance of the Four-Year Transfers to Jordan under 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 6(a) (Count V); 6) avoidance of the Four-Year Transfers to Stefany under 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 6(a) (Count VI); 7) recovery by the Trustee of the Four-Year Transfers to Jordan, which allegedly total $1,372,592 under 11 U.S.C. § 550 and avoided pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 5(a)(2) (Count VII); 8) recovery by the Trustee of the Four-Year Transfers, which allegedly total $49,934, to Stefany under 11 U.S.C. § 550 and

---

18140), The Upper Crust - South End, LLC (Case No. 12-18142), The Upper Crust - Pennsylvania Avenue, LLC (Case No. 12-18143), The Upper Crust – D.C., LLC (Case No. 12-18148), The Upper Crust - Waltham, LLC (Case No. 12-18144), The Upper Crust-Watertown, LLC (Case No. 12-18145), The Upper Crust-Wellesley, LLC (Case No. 12-18146), and JJB Hanson Management, Inc. (Case No. 12-18147) (collectively, the "Debtors"). The Court granted the Chapter 7 Trustee's Motion to Substantively Consolidate the Debtors' Bankruptcy Estates on April 10, 2013, approximately one month after the Debtors' Chapter 11 cases were converted to cases under Chapter 7.

avoided pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 5(a)(2) (Count VIII); 9) recovery by the Trustee of the Four-Year Transfers to Jordan under 11 U.S.C. § 550 and avoided pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 6(a) (Count IX); and 10) recovery by the Trustee of the Four-Year Transfers to Stefany under 11 U.S.C. § 550 and avoided pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Laws ch. 109A, § 6(a).[2] Specifically, the Defendants, relying upon the Third Affirmative Defense set forth in their "Amended Answer, Affirmative Defenses, Jury Demand and Counterclaim," contend that the Trustee's claims for relief are barred by a "Settlement Agreement and Mutual Release" (the "Settlement Agreement"), dated July 31, 2012, which was executed by Joshua Huggard ("Huggard"), as authorized agent of the Upper Crust, LLC, which was defined in the Settlement Agreement to include the entities identified in note 1, *supra;* by JJB Hanson Management, Inc. ("JJB"), through its authorized agent Huggard; by

---

[2] The Trustee, in paragraph 35 of his Complaint. alleged that "there existed at least one unsecured creditor of the Debtors who maintained the right to avoid the Four-Year Transfers to Jordan pursuant to M.G.L. ch. 109A, § 5(a)(2)." In paragraph 44, he made the same allegation with respect to Mrs. Tobins. In paragraph 50, the Trustee alleged that "there existed at least one unsecured creditor of the Debtors who maintained the right to avoid the Four-Year Transfers to Jordan pursuant to M.G.L. c. 109A, § 6(a). In paragraph 56, he made the same allegation with respect to Mrs. Tobins.

In his Reply to the Defendants' Opposition to his Motion for Summary Judgment and Opposition to the Defendants' Cross-Motion for Summary Judgment, the Trustee specifically identified TD Bank as a qualifying unsecured creditor for purposes of all his claims under 11 U.S.C. § 544. Specifically, he noted that, on December 8, 2014, TD Bank filed an amended general unsecured proof of claim in the amount of $1,377,026.66, identified as Claim No. 31-2 on the Claims Register for "monies loaned" by TD Bank to the Debtors. In its supporting documentation attached to its proof of claim, TD Bank stated that "[o]n or about April 25, 2007, TD Bank, N.A. established a term loan . . . in the original principal amount of $960,000" and made subsequent loans thereafter through December of 2010.

Cocobling, LLC ("Cocobling"), Coletrain, Inc. ("Coletrain") and Coleman, Inc. ("Coleman") through their authorized agent, Tobins; and by Huggard, Brendan Higgins ("Higgins"), and Daniel Hurley ("Hurley"), individually. Pursuant to the Settlement Agreement, Tobins caused to be paid to the Upper Crust $250,000 on September 28, 2012, less than one week prior to the October 4, 2012 filing of Chapter 11 bankruptcy petitions by the Upper Crust, LLC and its related entities.

The Chapter 7 Trustee through his Motion for Partial Summary Judgment seeks a determination that the Third Affirmative Defense which is premised on the release granted to the Defendants contained in the Settlement Agreement as well as the Settlement Agreement itself are not a bar to his claims for relief under 11 U.S.C. § 544(b) because he is not asserting those claims "standing in the shoes of the Debtor" but rather as "standing in the shoes of an unsecured creditor." He adds that his claims for relief under 11 U.S.C. § 548 are not barred because under the Bankruptcy Code he has the exclusive right to bring fraudulent transfer actions on behalf of creditors. The Trustee also seeks summary judgment as to the Defendants' Counterclaims because those claims are predicated on the Defendants' assumption that the Trustee violated the terms of the Settlement Agreement and the release granted to the Defendants contained in it by filing the Adversary Complaint. Specifically, the Defendants assert the following claims against the Trustee: Count I-Breach of Contract; Count II-Breach of the Covenant of Good Faith and Fair Dealing; and Count III-Violation of Mass. Gen. Laws. Ch. 93A, §§ 2, 11.

In their Opposition to the Plaintiff's Motion for Partial Summary Judgment and their Cross-Motion for Summary Judgment with respect to the Plaintiff's Motion for

Partial Summary Judgment, the Defendants seek dismissal of the all the Trustee's claims against them.[3]

**II. FACTS**

In 2005, Jordan, Huggard and Higgins formed the Upper Crust, which was the sole member of the entities identified in note 1, *supra.* The Debtors operated a chain of pizza restaurants that provided customers with traditional and innovative pizza combinations. On April 5, 2012, Upper Crust, JJB,[4] Cocobling,[5] Huggard and Higgins commenced an action in the Suffolk Superior Court, Department of the Massachusetts

---

[3] The Defendants filed a Motion to Withdraw the Reference pursuant to 11 U.S.C. § 157(d), on October 2, 2014, approximately six weeks after the Plaintiff commenced the adversary proceeding. On December 22, 2014, the United States District Court for the District of Massachusetts denied the motion without prejudice. The district court observed that while the parties agreed that this Court must treat the Trustee's fraudulent conveyance claims as non-core under Stern v. Marshall, 131 S. Ct. 2594 (2011), and Exec. Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165, 2173 (2014), and that the reference must be withdrawn before trial because the Defendants have a right to a jury trial on the Trustee's fraudulent conveyance claims and do not consent to trial in the bankruptcy court, they disagreed as to when the district court should withdraw the reference. The district court concluded that "the interests of efficiency and uniformity" were best served by leaving the proceeding in the bankruptcy court and that "the bankruptcy court will be best suited to preside over discovery and engage in pre-trial case management."

The Defendants moved to dismiss the adversary proceeding. Bankruptcy Judge Henry J. Boroff denied the motion on February 4, 2015. On February 9, 2016, Judge Boroff recused himself from Case Number 12-18134 as well as this and other adversary proceedings and the main case and adversary proceedings were assigned to this Court pursuant to MLBR 5001-1(d).

[4] JJB provided payroll, procurement and other financial services to the Debtors.

[5] Cocobling franchised the "Upper Crust" brand to independently owned and operated franchisees.

Trial Court against Tobins and Mrs. Tobins, Coletrain,[6] Coleman[7] and David Marcus ("Marcus"), a certified public accountant hired by Upper Crust to serve as Chief Financial Officer. In the their complaint, the plaintiffs averred that Tobins, Huggard and Higgins were managers of Upper Crust and Cocobling and that ownership interests in those two entities were divided such that that Tobins owned 45%, Huggard owned 40% and Higgins owned 15%. With respect to JJB, the plaintiffs averred that Tobins, Huggard and Higgins each owned one-third of its capital stock. In addition, the plaintiffs averred that Tobins owned 80% of the common stock of Coletrain and Coleman and that Huggard and Higgins each owned 10% of the common stock of those two corporations. As noted above, Coletrain owned the Upper Crust trademark by virtue of a license agreement and was entitled to license fees ranging from 1%-5% of annual gross sales of the Upper Crust entities. In their complaint, the plaintiffs alleged that Tobins "commenced a course of conduct that would ultimately cheat his partners . . . and systematically loot Upper Crust" to finance a lavish lifestyle involving his yacht, vacation home, Cessna airplane, and vacation travel. They formulated the following counts: Count I – Breach of Fiduciary Duty (Huggard and Higgins v. Tobins); Count II - Conversion (Upper Crust, JJB, and Cocobling v. Tobins); Count III - Unjust Enrichment (plaintiffs v. Tobins); Count IV-Civil Conspiracy (plaintiffs v. Tobins and Marcus); Count V - Equitable Attachment (Huggard,

---

[6] Coletrain owned and operated an Upper Crust restaurant located at 20 Charles Street, Boston, Massachusetts. It also owned the Upper Crust trademark.

[7] Coleman owned and operated an Upper Crust restaurant located at 286 Harvard Street, Brookline, Massachusetts.

Higgins and Upper Crust v. Tobins); Count VI - Receivership (Upper Crust, JJB, Huggard and Higgins v. Tobins, Coletrain and Coleman); Count VII - Unjust Enrichment (Upper Crust v. Stefany).

The defendants in the state court action filed an answer and, in addition, set forth affirmative defenses, and counterclaims, that in some respects mirrored the claims for relief made by the plaintiffs. The counterclaims included the following: Count I - Breach of Fiduciary Duty (Tobins, Coleman and Coletrain v. Huggard and Higgins); Count II - Inspection of Corporate Records, (pursuant to Mass. Gen. Laws ch. 156D, § 16.05) (Tobins v. Huggard and Higgins); Count III - Inspection of Corporate Records (pursuant to Mass. Gen. Laws ch. 156C, §10); Count IV - Conversion (Coleman and Coletrain v. Huggard and Higgins); Count V - Breach of Contract (Coletrain v. Upper Crust); Count VI - Breach of Covenant of Good Faith and Fair Dealing (Coletrain v. Upper Crust); Count VII - Unfair Competition under Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)) (Coletrain v. Upper Crust –Alternative to Counts V and VI); Count VIII - False Designation of Origin-15 U.S.C. § 1125(a) (Coletrain v. Upper Crust-Alternative to Counts V and VI); Count IX - Common Law Trademark Infringement) (Coletrain v. the Upper Crust - Alternative to Counts V and VI); Count X - Violation of Chapter 93A (Coletrain v. Upper Crust); Count XI - Accounting (Coletrain v. Upper Crust); Count XII - Appointment of Receiver (Tobins v. Upper Crust); Count XIII - Conversion (Tobins, directly and on behalf of the Upper Crust v. Huggard, Higgins and Upper Crust); and Count XIV - Conspiracy (Tobins v. Huggard and Higgins). The defendants alleged that "[o]n or about March 12, 2013, Huggard and Higgins hijacked the Upper Crust enterprise

by cutting off the founder and largest shareholder, Jordan Tobins, entirely from the business . . . Huggard and Higgins did not even purport to take any formal corporate action; instead, they simply forced out, locked out and froze out their business partner."

After the commencement of the litigation, the parties engaged in settlement discussions and, on July 31, 2012, executed the Settlement Agreement which provided that there would be no accounting of any liability for past expenses, salaries, distributions incurred or paid by any of the Upper Crust entities to Higgins, Huggard, or the defendants and that there would be no accounting of any liabilities for any trademark license fees or royalties. In addition, the Settlement Agreement provided in pertinent part the following:

> 18. Tobins will pay or cause to be paid, by cash, bank check or wired funds, $250,000 to the Upper Crust, said payment to be made no later than October 1, 2012 (the "Closing Payment") and shall be made to an account or payee as designated by the Upper Crust in writing. Upon receipt of said Closing Payment: . . .
>
> > a. Tobins shall receive 100% ownership of Coleman, Coletrain and Cocobling, including the domain names associated with each . . .
> >
> > b. Higgins/Huggard shall collectively receive 100% ownership of the Upper Crust and JJB.
> >
> > c. The Litigation shall be dismissed with prejudice, with all rights of appeal waived and each side bearing its own costs and attorneys' fees.
> >
> > d. In the event the Closing Payment is not received by the Closing Date, this Agreement shall, at the option of Huggard/Higgins, become null and void.
>
> The Parties agree to cooperate in obtaining any necessary court and/or secured lender approvals to effectuate such transfers, and, once achieved,

> agree to execute the documents attached hereto at Exhibits A-E to make such transfers. Pending and in the absence of such approval, the Parties will, upon said Closing Payment, hold the interests to be transferred in trust for the other Party . . . and will operate the respective business and entities as if such transfers occurred . . . .
>
> ***
>
> 22. Tobins, Coletrain, Coleman, and/or Cocobling will assume, pay and resolve the following liabilities as they become due
>
> > a. The class action liability (Pinto, et al. v. Upper Crust el al., Massachusetts Suffolk Superior Court, Civil Action No. 2010-02847) up to $250,000. Tobins, Coletrain, Coleman and/or Cocobling agree to pay 24% of any amounts paid over $250,000 and, Higgins/Huggard, Upper Crust and/or JJB will pay 76% of any such excess.[8]

---

[8] In the Debtors' Motion for Authorization of (1) the Interim and Permanent Use of Cash Collateral, (2) the Granting of Adequate Protection, (3) Entry of Scheduling Order Regarding Continued Use of Cash Collateral, and (4) Additional Relief (the "Cash Collateral Motion"), which was attached to the Affidavit of Richard Briansky filed in support of the Defendants' Motion for Summary Judgment, the Defendants disclosed that, "[o]n July 16, 2010, certain employees and former employees of the Debtors filed a complaint against Upper Crust and Tobins in Suffolk County Superior Court . . . alleging that they had been pressured to return the back wages paid to them" pursuant to an order entered by the United States Department of Labor. Shannon Liss-Riordan, Esq., who is record counsel for the plaintiff class in the so-called Pinto Litigation, in an Affidavit attached to the Trustee's Opposition to the Motion for Summary Judgment, represented that the Suffolk Superior Court entered injunctions against Tobins, Huggard and Higgins in this action. Tobins was enjoined from transferring "his personal ownership or interest in any assets, regardless of whether those assets are owned solely by him or jointly with other persons," including "yachts, planes, real estate, The Upper Crust, LLC (or related corporations, partnerships, or other entities), or any other such asset with a cash or fair market value of greater than $2,500." The Upper Crust, JJB, Hanson, Huggard and Higgins were also enjoined from transferring ownership or interests in any assets, except for expenditures required in the ordinary course of business. Tobins ostensibly settled claims made against him personally in the Pinto Litigation in November of 2013.

> b. The liability to the Department of Labor ("DOL") which may result from settlement or trial on account of the ongoing investigation by the DOL of the Former Upper Crust Entities.[9]
>
> c. 24% of the liability in the action ZVI Construction Company, LLC v. The Upper Crust, LLC et al., Massachusetts Superior Court, Civil Action No. 2012-1369, with Huggard/Higgins, Upper Crust and/or JJB paying 76% of such liability.[10]
>
> ***
>
> 26. Notwithstanding the foregoing, Tobins agrees to pay any amounts due his grandmother loaned by her to the Former Upper Crust Entities . . . .

---

[9] In the Debtors' Cash Collateral Motion, they disclosed that the DOL in 2009 conducted "an investigation as to whether Upper Crust had improperly failed to pay its employees overtime wages . . . [and]. . . [a]s a result of the DOL order following the investigation, Upper Crust paid back wages of approximately $342,000 to 121 workers between July and September 2009."

[10] In the Debtor's Cash Collateral Motion, they disclosed that ZVI Construction Company, LLC ("ZVI") filed a complaint against Upper Crust, Upper Crust - Back Bay, Upper Crust – State Street, Upper Crust – Wellesley, JJB, Cocobling, Tobins, Higgins and Huggard in Suffolk Superior Court seeking recovery of approximately $700,000 allegedly owed for improvements to certain restaurant locations. Tobins ostensibly obtained the $250,000 which he paid to the Debtors from Ditmars Limited ("Ditmars") which filed an adversary proceeding against the Debtors at the inception of the Chapter 11 case, seeking the imposition of a constructive trust. It also moved in the main case to segregate the funds. In its complaint, which it dismissed in 2016, it alleged that Tobins was negotiating with it about a possible investment in Coletrain and other entities and that it advanced $250,000 to Tobins for payment to the Debtors, conditioned upon that payment being made to ZVI. According to Ditmars, Debtors' counsel, Franklin H. Levy of Lawson & Weitzen LLP, was to hold the funds in escrow pending distribution, a position rejected by the Debtors as no escrow was made or proposed in the Settlement Agreement. Nevertheless, the funds were distributed during the Chapter 11. The Chapter 7 Trustee testified at his deposition, which was held on May 21, 2015, that none of the funds remained in the estate at the time of his appointment and that, should Tobins seek recovery of any portion of the funds, his remedy was the filing of a proof of claim, although the deadline to do so had long since passed. Notably, the Court denied the motion to segregate funds on November 1, 2012.

> 27. Subject to any required court approvals, Huggard, Higgins and Tobins will secure each of their respective financial obligations (including the obligations regarding debts and liabilities) hereunder by pledging his respective corporate ownership interests to the others . . . by executing the documents attached hereto as Exhibits F-H. . . .
>
> 28. Subject to the foregoing, the Huggard/Higgins Parties and Hurley do hereby remise, release and forever discharge the Tobins Parties of and from any and all debts, actions, causes of, [sic] action, suits, accounts, covenants, contracts, omissions, liens, controversies, agreements, damages, and any and all claims, sums of money, demands and liabilities whatsoever of every name and nature, both in law and equity, known or unknown, direct or derivative, which the Huggard/Higgins Parties and/or Hurley now have or ever had against any of the Tobins Parties, including those claims which were or could have been asserted in the Litigation. The Huggard/Higgins Parties and Hurley further agree and promise that they will not file, charge, claim, sue or cause or permit to be filed or charged, any action or claim for damages or other relief against any of the Tobins Parties for any matter arising from the creation of this earth to the date of the execution of this Agreement. Nothing in the foregoing release shall relieve the Tobins Parties of their obligations under this Agreement or for any act occurring after the receipt of the Closing Payment.
>
> ***
>
> 35. This Agreement was negotiated in good faith and constitutes a fair and reasonable resolution of this dispute . . . .
>
> ***
>
> 39. This Agreement represents the entire agreement between the Parties and may be amended, supplemented or modified only by a writing signed by both the Parties. The foregoing notwithstanding, the Parties agreed to cooperate and execute any documents or take any additional action consistent with the terms of this Agreement, and it is expressly acknowledged that such obligations are expected and that time is of the essence in executing such documents to taking such action.

The Exhibits referenced in the Settlement Agreement were never executed, the action commenced in the state court on April 5, 2012 was not dismissed, and, according to the Defendants, "remains active (but administratively stayed)." The parties agreed to

mediate in binding arbitration any disputes that arose under the Settlement Agreement, but as noted above Upper Crust and its related entities filed Chapter 11 petitions on October 4, 2012, less than one week after the Closing Payment. On March 6, 2013, the Upper Crust's cases were converted to Chapter 7 and Mark DeGiacomo was appointed as the Chapter 7 trustee.

**III. DISCUSSION**

A. Positons of the Parties

The Defendants rely upon the release in their favor contained in paragraph 28 of the Settlement Agreement to argue that the Trustee's claims for relief are precluded as a matter of law. The Defendants contend that the release is enforceable even if the Defendants did not comply with the terms of the Settlement Agreement because the Settlement Agreement is a "substituted contract." The Trustee counters that the Settlement Agreement is not enforceable and is invalid due to the failure to obtain necessary Superior Court approvals with respect to asset transfers and was never consummated due to the parties' failure to satisfy material conditions precedent. The Trustee adds that the reasonable time for performing conditions precedent under the "time is of the essence clause" in the Settlement Agreement has passed. He also asserts that material disputed facts remain concerning (1) whether the parties intended (a) the Settlement Agreement to be a substituted contract and (b) whether the Tobins's release was to become effective immediately upon execution of the Settlement Agreement or delayed subject to the satisfaction of a condition precedent; (2) whether Tobins had the authority to deliver legal title to the Closing Payment; and (3) whether the Debtors

received legal and equitable ownership rights in the $250,000 Closing Payment in light of the source of the payment, namely Ditmars Ltd., not Tobins personally.

The Trustee, however, also asserts that resolution of the issue raised by the Defendants' Motion for Summary Judgment, is unnecessary, if he is not bound by the release. The Trustee argues that the release granted to Tobins and Mrs. Tobins does not preclude his claims under 11 U.S.C. § 544(b)(1) because he is asserting those claims pursuant to his avoiding powers as trustee and the transfers would be avoidable by an actual unsecured creditor at the time of the transfer. He cites Tomsic v. Pitocchelli (In re Tri-Star Techs. Co., Inc.), 260 B.R. 319, 323-24 (Bankr. D. Mass. 2001) ("Section 544(b) . . . permits the estate representative to wear the mantel of an actual unsecured creditor who could have avoided a prepetition transfer under 'applicable [non-bankruptcy] law.'"), in support of his position. He contends that, under 11 U.S.C. § 548, he is the only party that has standing to pursue fraudulent transfer claims, citing Kapila v. Bennett (In re Pearlman), 472 B.R. 115, 121-22 (Bankr. M.D. Fla.), *aff'd*, 478 B.R. 448 (M.D. Fla. 2012). He adds that the Defendants' counterclaims fail as a matter of law because their alleged theory of liability is based on the viability of the release.

In response to the Trustee's Motion for Partial Summary Judgment, the Defendants argue that his attempt to avoid the Settlement Agreement under his avoidance powers fails as a matter of law. They state:

> First, the Trustee lacks standing to assert any claims for fraudulent conveyance because the claims are not property of the estate and are not, therefore, subject to avoidance [under] either 11 U.S.C. §§ 544 or 548. Rather, the Upper Crust waived and released all claims against the Tobins, including the right to seek the return of the funds allegedly diverted, in

> exchange for payment of $250,000 before it filed for bankruptcy. Second, the Trustee has failed to identify any general unsecured creditor that had a claim for fraudulent conveyance against either Jordan, a corporate officer, or Stefany, an employee. Nor can he because any claim under 11 U.S.C. §544 against the Tobins is derivative and may only be asserted through the Upper Crust.

B. Summary Judgment Standard

The United States Court of Appeals for the First Circuit articulated the well-established standard for summary judgment in Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 (1st Cir.1994). It stated:

> It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c). As to issues on which the movant, at trial, would be obliged to carry the burden of proof, he initially must proffer materials of evidentiary or quasi—evidentiary quality-say, affidavits or depositions—that support his position. When the summary judgment record is complete, all reasonable inferences from the facts must be drawn in the manner most favorable to the nonmovant. This means, of course, that summary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record. . . .

Id. at 763 (1st Cir.1994) (citations omitted, footnote omitted).

C. Applicable Law

The Trustee, exercising his "strong arm" powers, relies upon § 544(b) which authorizes a trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title. . . ." 11 U.S.C. § 544(b). According to the court in Lyon v. Eiseman (In re Forbes), 372 B.R. 321 (B.A.P. 6th Cir. 2007), "[e]ssentially, this provision permits the trustee to 'stand in the shoes' of

an unsecured creditor and assert causes of action under state fraudulent conveyance laws for the benefit of all creditors." Id. at 330 (citing Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.), 714 F.2d 1266, 1275 (5th Cir.1983); Belfance v. Bushey (In re Bushey), 210 B.R. 95, 100 (6th Cir. BAP 1997)).

In Guttman v. Fabian (In re Fabian), 458 B.R. 235 (Bankr. D. Md. 2011), the court explained the role of the trustee with respect to causes of action arising under § 544, stating:

> A bankruptcy trustee's causes of action to recover fraudulent conveyances and preferential transfers, are independent of, and separate from, prepetition causes of action possessed by the debtor outside of bankruptcy. These actions arise after the petition date, and therefore are not themselves property of the estate. In Guttman v. Martin (In re Railworks Corp.), 325 B.R. 709, 721 (Bankr. D. Md. 2005), this Court (Derby, J.) stated that
>
>> Avoidance claims are not within the definition of property of the bankruptcy estate, because they [the claims] do not represent an interest of the debtor in property. *See* 11 U.S.C. § 541(a). Rather, they are rights that the trustee and a debtor in possession are given in a bankruptcy case.
>
> Id. (citing 11 U.S.C. §§ 544, 545, 547, 548, 549, 550).
>
> This is because the right to avoid and recover fraudulent transfers outside of bankruptcy belongs to the creditors, and not to the debtor. Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics), 226 F.3d 237, 242 (3d Cir. 2000) ("Thus, at least outside of the context of bankruptcy, it is clear that a fraudulent transfer claim arising from Cybergenics' transfers and obligations belongs to Cybergenics' creditors, not to Cybergenics."). Section 544 transfers the right to recover fraudulent transfers from individual creditors to the bankruptcy trustee (or the debtor in possession) acting as a fiduciary on behalf of all creditors. Thus, any recovery of fraudulent conveyances pursuant to Section 544 is not limited to the amount of the claim of an individual creditor, but to the full extent of the conveyance. Moore v. Bay, 284 U.S. 4, 5, 52 S.Ct. 3, 76 L.Ed. 133 (1931). "Nevertheless, property that the trustee recovers from an avoidance claim

> becomes property of the bankruptcy estate," Railworks, 325 B.R. 709, 721 citing 11 U.S.C. § 541(a)(3) and (7).
>
> The trustee is expressly authorized to bring an action to avoid a transfer as fraudulent, pursuant to Section 11 U.S.C. § 548(a). The trustee has the exclusive right to bring a fraudulent conveyance action during the pendency of the bankruptcy proceedings. Hatchett v. U.S., 330 F.3d 875, 886 (6th Cir. 2003), *cert. denied*, 541 U.S. 1029, 124 S.Ct. 2094, 158 L.Ed.2d 709 (2004). . . .

In re Fabian, 458 B.R. at 258-59 (footnotes omitted). *See also* In re Cybergenics Corporation, 226 F.3d 237, 243-44 (3d Cir. 2000) ("The power to avoid the debtor's prepetition transfers and obligations to maximize the bankruptcy estate for the benefit of creditors has been called a "legal fiction" by one court. *See* Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1523 (10th Cir. 1990). It puts the debtor in possession 'in the overshoes' of a creditor. . . . This attribute is no more an asset of Cybergenics as debtor in possession than it would be a personal asset of a trustee, had one been appointed in this case. Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors."); In re Worldcom, Inc., 401 B.R. 637, 645-46 (Bankr. S.D.N.Y. 2009).[11]

---

[11] In Worldcom, Inc., the court observed:

> WorldCom misconstrues the role of the trustee and the nature of the actions being asserted by the OneStar Trustee. When the OneStar Trustee was elected the representative of the estate, he became a successor in interest to OneStar. *See* Coleman v. Alcock, 272 F.2d 618, 621 (5th Cir. 1959) ("The Trustee is, of course, a successor of the [debtor] for many purposes."). As a successor to OneStar's interests, the OneStar Trustee is bound by any judgments to the extent OneStar was bound. *See* Teltronics, 642 F.2d at 37 ("[A] judgment rendered against a bankrupt prior to his bankruptcy is

In view of the authorities referenced above, the Court concludes that the Defendants' Third Affirmative Defense lacks merit. Even assuming that the Settlement Agreement and the concomitant release of the Defendants is enforceable among the parties executing it and binding upon Huggard, Higgins, Upper Crust, JJB and Cocobling, the creditors of Upper Crust, in whose shoes the Trustee stands, cannot be included among that group. Accordingly, the Trustee is not bound by any terms of the Settlement Agreement, whether it can be construed as a substituted contract or not.[12] It follows, that the Defendants counterclaims against the Trustee also lack merit.

---

> conclusive upon the trustee.") (citing 1B J. Moore, Federal Practice P 0.419(3.–6) at 3124–25 (2d ed.1965*)); see also* Coleman, 272 F.2d at 622 ("If the [debtor's] property is involved the trustee will be bound by the judgment to the same extent as any other person who succeeds to an interest in property. . . ."). But as the representative of the estate, *see* 11 U.S.C. § 323(a), "the Trustee is not simply the successor in interest to the Debtor: he represents the interest of all creditors of the Debtor's bankruptcy estate." Corzin v. Fordu (In re Fordu), 201 F.3d 693, 705 (6th Cir. 1999). *Even though the OneStar Trustee is a successor in interest to the causes of actions and judgments of OneStar, the avoidance actions at issue were never an interest in property of OneStar, but rather belong to OneStar's creditors*. *See* Bethlehem Steel Corp. v. Moran Towing Corp., 390 B.R. 784, 786 (Bankr. S.D.N.Y. 2008) ("Avoidance actions brought pursuant to the . . . Code never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession. . . ."). The avoidance actions only arose upon the filing of OneStar's petition and at their inception became a part of the OneStar estate. Therefore, OneStar did not bind the OneStar Trustee in his pursuit of such actions.

In re Worldcom, Inc., 401 B.R. at 646 (footnotes omitted, emphasis supplied).

[12] In Community Builders, Inc. v. Indian Motocycle Assocs., Inc., 44 Mass. App. Ct. 537, 547, n.19, 692 N.E.3d 964, 971, n.19 (1998), the court explained a substituted contract as follows:

In addition, the Court rejects the Defendants' assertion that the Trustee' has failed to identify an existing creditor for purposes of his claims under § 544(b)(1), *see* In re Forbes, 372 B.R. at 330 ("[t]he plain language of § 544(b) contains four requirements: (1) [a] creditor, (2) holding an allowable unsecured claim; and (3) a transfer of an interest of the debtor in property, (4) that is voidable under applicable [state] law."). The Defendants did not move initially for summary judgment based upon the absence of a creditor holding an allowable unsecured claim, and the Trustee's Motion for Partial Summary Judgment merely requested a determination as to the viability of the Settlement Agreement for purposes of his Motion for Partial Summary Judgment, as well as summary judgment with respect to the counterclaims against him asserted by the

---

> In cases where it is held that full performance of the revised contract terms is necessary to extinguish or discharge claims arising under the old contract, the revised contract is called an "executory accord," and the performance is called a "satisfaction." In cases where the mutual promises in the revised contract are held by themselves to discharge all claims arising under the earlier contract, the revised contract is called a "substituted contract." *See Restatement (Second) of Contracts* §§ 279, 281 (1981).

Id. *See also* Pagounis v. Pendleton, 52 Mass. App. Ct. 270, 753 N.E.2d 808 (2001) ("Without the agreement of the parties to an extinguishment of the prior contract and to a substitution of the new contract, there can be no novation."). The Court observes that, in the absence of evidence of an original contract among Tobins, Huggard and Higgins and the various limited liability companies and corporations through which they did business, as well as a clear and definite indication in the Settlement Agreement of intent among all the parties that Tobins would be discharged from any and all claims regardless of the performance of the myriad duties imposed upon the parties in their Settlement Agreement, the concept and application of of a substituted contract to the facts of this case is strained at best, particularly where the only performance under the Settlement Agreement was the payment of money; none of the other actions incident to the parties' "corporate divorce" were effectuated.

Defendants. Nevertheless, as noted above, the Trustee, in his Complaint at paragraphs 35, 44, 50, 56, alleged the existence of at least one unsecured creditor who maintained the right to avoid prepetition transfers made by the Debtors to the Defendants, and he subsequently identified TD Bank as a qualifying unsecured creditor for purposes of all the § 544 claims.

**IV. CONCLUSION**

In view of the foregoing, the Court shall enter an order granting the Plaintiff's Motion for Partial Summary Judgment with respect to the Defendants' Third Affirmative Defense and counterclaims set forth in their Amended Answer, Affirmative Defenses, Jury Demand and Counterclaim, and denying the Defendants' Cross-Motion for Summary Judgment. The Plaintiff's Complaint is based upon the Trustee's avoiding powers under 11 U.S.C. § 544(b) and contains independent, statutory claims for relief that are not barred by any prepetition release granted to the Defendants by the Debtor.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: July 20, 2016